# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| Federal Deposit Insurance Corporation, as Receiver for the Peotone Bank & Trust Company, Peotone, Illinois, | )<br>)<br>) |
| Plaintiff, | ) |
| v. | ) No. 11 CV 4061 |
| Craig Campbell, not Individually, but as Trustee of the Lyle P. Campbell 1999 Irrevocable Trust, | ) Magistrate Judge Susan E. Cox<br>)<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The Federal Deposit Insurance Corporation ("FDIC-R"), as Receiver for the Peotone Bank & Trust Company ("Bank"), seeks to recover the full surrender value of a life insurance policy. The Bank purchased the life insurance policy ("Policy") for one of its executives, Lyle Campbell, as an inducement for Mr. Campbell to remain employed with the Bank. The Bank then assigned the Policy rights to a trust in his name, the Lyle P. Campbell 1999 Irrevocable Trust ("Trust"), with Craig Campbell as the trustee. When FDIC-R attempted to terminate the Trust's rights, and recover the full surrender value of the Policy, the Trust filed suit. Now before the Court is FDIC-R's combined motion for judgment on the pleadings and motion to dismiss [dkt 29]. For the reasons discussed herein, FDIC-R's motion is granted.

## I.   Procedural History

The Policy in dispute here was issued by Midland National Life Insurance Company ("Midland"). On June 15, 2011, Midland filed a complaint seeking interpleader relief to determine

who was entitled to the full surrender value of the Policy.[1] On August 2, 2011, FDIC-R filed an answer, counterclaim and cross-claim for declaratory relief to determine all parties' rights to the full surrender value.[2] On August 15, 2011, the Trustee filed an answer and counterclaim against Midland[3] and an answer and cross-claim against FDIC-R,[4] both for declaratory judgment and unjust enrichment. On August 23, 2011, the parties filed a joint motion to voluntarily dismiss the counterclaims against Midland and dismiss Midland from the action,[5] which this Court granted. As a result, FDIC-R became the named plaintiff.[6] On August 31, 2011, FDIC-R filed the present motion.[7]

## II.  Facts

By 1999, Mr. Campbell had been an executive of the Bank for several years.[8] That same year, the Bank purchased the Policy at issue.[9] The Policy was originally purchased from Clarica Life Insurance Company-US, and later assumed by Midland.[10] The Policy insured the lives of Mr. Campbell and his wife Nancy L. Campbell.[11]

On June 12, 2000, the Bank and the Trust entered into a Collateral Assignment Split Dollar Agreement ("Assignment"), "to encourage [Mr. Campbell] to remain an employee of the [Bank]..."[12] The Assignment specifies that the Bank would pay the premium on the Policy in exchange for a

---

[1] Dkt 1.
[2] Dkt 11.
[3] Dkt 17.
[4] Dkt 19.
[5] Dkt 23.
[6] Dkt 31.
[7] Dkt 29.
[8] Craig Campbell's Cross-Claim ¶9, dkt. 19 (hereinafter "Trust's Cross-Claim").
[9] Trust's Cross-Claim ¶7.
[10] Trust's Cross-Claim ¶7.
[11] Trust's Cross-Claim ¶7.
[12] Peotone Bank and Trust Company Collateral Assignment Split Dollar Agreement, ¶Introduction, attached to FDIC-R Answer, Cross-Claim and Counter-Claim as Exhibit A, dkt. 11-1 (hereinafter "Assignment").

portion of "the death proceeds" of the Policy.[13] There is no dispute that the Bank paid the $366,000 premium due on the Policy.[14] The Assignment identifies the Trust as the owner of the Policy and the Bank as the Assignee.[15] The Assignment then provides that the Trust has "[a]ll incidents of ownership...subject to the conditions hereafter set forth."[16]

On April 23, 2010, the Bank was closed and FDIC-R became its receiver.[17] Pursuant to its rights as receiver, FDIC-R succeeded all of the rights, title and interests of the Bank, including the Assignment.[18] On January 7, 2011, FDIC-R sought to terminate the Assignment pursuant to its rights under the clause "Termination Clause of Agreement" (hereinafter "Termination Clause"), by providing the Trust with 30-day written notice.[19] In response to FDIC-R's notification of termination, the Assignment provides the Trust with the right to exercise a 90-day option to "buy-back" the Policy (hereinafter "Option").[20] On January 10, 2011, FDIC-R sent written notice to Midland about the termination and requested payment of the Policy's cash surrender value.[21] On May 5, 2011, the Trust sent written notification to Midland and FDIC-R of its objection to any payouts inconsistent with the Trust's rights under the Policy and Assignment.[22] In that letter, the Trust attempted to extend the option period.[23]

The 90-day option period started 30-days after written notice to the Trust on February 7,

---

[13] Assignment ¶Introduction.
[14] Last Survivor Flexible Premium Adjustable Life Insurance Policy, p. 3, attached to the Trust Cross-Claim as Exhibit A, dkt 19 (hereinafter the "Policy"); Trust's Cross-Claim ¶24.
[15] Assignment ¶Preamble.
[16] Assignment ¶Introduction.
[17] FDIC-R's Answer, Cross-Claim and Counterclaim ¶2, dkt 11 (hereinafter "FDIC-R's Counterclaim").
[18] 12 U.S.C. §1821(d)(2)(A)(1); FDIC-R Counterclaim ¶2.
[19] FDIC-R's Letter to Craig Campbell, Trustee, dated January 7, 2011, attached as Exhibit B to FDIC-R Counterclaim.
[20] Assignment ¶IX.
[21] FDIC-R's Letter to Midland, dated January 10, 2011, attached as Exhibit C to FDIC-R Counterclaim.
[22] Trust's Letter to attorneys for Midland and FDIC-R, dated May 5, 2011, attached as Exhibit D to FDIC-R Counterclaim.
[23] *Id.*

2011 and closed 90 days later on May 7, 2011.[24] The Trust failed to exercise its Option by May 7, 2011, the final day of the 90 day period.[25] On May 11, 2011, as a result of the Trust failing to exercise its Option, FDIC-R again requested via letter that Midland distribute the full surrender value of the Policy to FDIC-R, pursuant to the clause, "Division of the Net Cash Surrender Value of the Policy" ("Cash Surrender Clause").[26] The full surrender value is the policy value less policy loans owed to Midland.[27] The policy value is calculated as interest compounded on the difference between the premiums paid and cost of insurance.[28] On May 31, 2011, the full surrender value of the Policy was $583,896.63 ("full surrender value").[29] The parties agree that there are no premium defaults, loans or cash withdrawals that would diminish the full surrender value.

## III. Standard of Review

FDIC-R moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) and a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(c) and a 12 (b)(6) motion are analyzed under the same standard.[30] When ruling on a motion for judgment on the pleadings or motion to dismiss, the Court "must construe all allegations in the complaint in a light most favorable to the non-moving party"[31] and "may consider documents incorporated by reference in the pleadings."[32] A motion for judgement on the pleadings or a motion to dismiss should only be granted if "the court is convinced that the nonmoving party can plead no facts to establish

---

[24] Assignment ¶IX.
[25] FDIC-R Counterclaim ¶16.
[26] Trust's Cross-Claim ¶11.
[27] The Policy p. 9.
[28] The Policy p. 8.
[29] Trust's Cross-Claim ¶11.
[30] *River Village West LLC v. People Gas Light and Coke Co.*, 618 F. Supp. 2d 847, 850 (N.D. Ill. 2008) (*citing Guise v. BMW Mortgage, LLC*, 337 F.3d 795, 798 (7th Cir. 2004)).
[31] *River Village West LLC*, 618 F. Supp. 2d at 850 (*citing Thompson v. Ill. Dep't. Of Prof'l Reg.*, 300 F.3d 750, 753 (7th Cir. 2002)).
[32] *River Village West LLC*, 618 F. Supp. 2d at 850.

a claim or defense."[33]

**IV.    Analysis**

The first motion the Court must consider is FDIC-R's motion for judgment on the pleadings. Here FDIC-R argues it is entitled to the full surrender value based on the plain language of the Assignment. The second motion is FDIC-R's motion to dismiss the Trustee's unjust enrichment claim because, it argues, such a claim will not lie where an express contract governs the Parties' rights.

**A.    FDIC-R's Motion for Judgment on the Pleadings**

FDIC-R's right to the full surrender value is dependent on: (1) whether FDIC-R properly terminated the assignment and (2) the interpretation and application of the Cash Surrender Clause. FDIC-R argues that it is entitled to the distribution of the full surrender value because, most importantly, FDIC-R had the right to terminate the Assignment and force surrender of the Policy unless the Trust exercised its option to buy back the Policy, which it did not do.

The Trust, however, claims that two necessary prerequisites were not triggered to entitle FDIC-R to the full surrender value. Because those prerequisites were not triggered, the Trust argues that it is entitled to the difference between the full surrender value and the one time premium payment of $366,000.00.

The resolution of this motion is dependent on the Court's interpretation of the language of the Assignment. The interpretation of contract is a matter of law to be determined by the Court.[34] The primary objective in contract construction is to give effect to the intention of the parties... ."[35]

---

[33]*U.S. v. Wood*, 925 F.2d 1580, 1581 (7th Cir. 1991).
[34]*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F. 3d 376, 394 (7th Cir. 2003).
[35]*Tishman Midwest Mangmt. Corp. v. Wayne Jarvis, Ltd.*, 146 Ill. App. 3d 684, 689, 500 N.E.2d 431, 434 (1986).

A written contract is presumed to speak to the intentions of the parties.[36] A written contract speaks for itself.[37] The language of a contract should be given "[its] ordinary and natural meaning... ."[38] The Court may only use extrinsic evidence if the language of the contract is ambiguous.[39] Language is ambiguous "if the language is reasonably or fairly susceptible to more than one construction."[40]

### 1. FDIC-R Properly Terminated the Assignment

FDIC-R argues that it had an unequivocal right to terminate the Assignment pursuant to subsection A of the Termination Clause. The Trust argues that FDIC-R did not have the right to terminate because the Trust was the owner of the Policy and, therefore, has unconditional rights in the Policy proceeds, except as to premiums paid.

The Assignment defines the Trust's rights as "all incidents of ownership, including the power to surrender, terminate, or cancel the above described policy...subject to the conditions hereinafter set forth."[41] The Termination Clause allows for the termination of the Assignment under any one of three circumstances: (A) either party may terminate the Assignment if they give 30-day written notice to the other party; (B) the Trust fails to pay its proportionate share of premiums; or (C) the Trust seeks a release of the Assignment.[42] Both parties agree that there was no default in premiums and that the Trust did not seek a release. Therefore, subsections B and C of the Termination Clause are inapplicable here.

We are, therefore, left with only one option for termination: Subsection A. Again, this subsection gives either party the right to terminate the Assignment provided that the non-terminating

---

[36]*Cromeens, Holloman, Sibert, Inc.*, 349 F. 3d at 394.
[37]*Id.*
[38]*Omnitrus Merging Corp v. Illinois Tool Works*, 256 Ill. App. 3d 31, 33, 628 N.E.2d 1165, 1168 (1st Dist. 1993).
[39]*Cromeens, Holloman, Sibert, Inc.*, 349 F. 3d at 394.
[40]*Tishman Midwest Mangmt. Corp.*, 146 Ill. App. 3d at 689.
[41]Assignment ¶Introduction.
[42]Assignment ¶IX.

party is given 30-day written notice.[43] Although, the Trust was the owner of the Policy, the Assignment limited the Trust's rights and conferred certain rights to the Bank. One of those rights was the right to terminate provided that the Bank, and now FDIC-R, gave the Trust proper notice. FDIC-R provided the Trust with written notice on January 7, 2011. Without the 90 day option to buy-back the Policy being exercised, the Assignment was terminated as of February 7, 2011. The Trust has failed to point to any language in the Assignment that contradicts or challenges FDIC-R's right to terminate under the Termination Clause. Based on the plain meaning of the Termination Clause, the Assignment unambiguously provides FDIC-R with the right to terminate the Assignment, and FDIC-R properly acted on its right.

### 2. The Cash Surrender Clause Applies

Once a party terminates the Assignment, the Termination Clause provides that the proceeds of the Policy are to be distributed under either the Cash Surrender Clause or the Division of Death Proceeds Clause ("Death Proceeds Clause"). FDIC-R argues that its is entitled to a distribution of the full surrender value because the Termination Clause directs the proceeds to be distributed pursuant to the Cash Surrender Clause. The Trust, however, argues that the proceeds should not be distributed pursuant to the Cash Surrender Clause because the prerequisites of that paragraph have not been met. Instead, the Trust argues that the Assignment contemplates a division of the Policy proceeds.

The Termination Clause allows the Trust to:

> have a 90-day Option to receive from the Assignee a release of assignment of the policy in consideration of a cash payment to the Assignee which is the greater of: (1) the total premium payments made or, less any loans advanced under Paragraph V; or (2) the net cash surrender value of the policy... .[44]

---

[43]Assignment ¶IX.
[44]Assignment ¶IX.

The Trust agrees that without exercising its Option within the 90-day period, "the subject policy will be surrendered to the Insurer and the proceeds distributed...as prescribed by Paragraphs VII and VIII, herein."[45] Paragraph VII is the Death Proceeds Clause. Paragraph VIII is the Cash Surrender Clause. The Death Proceeds Clause only applies to the division of proceeds if Mr. or Mrs. Campbell die. Both parties agree that neither of them have died. Therefore, we need only look to the Cash Surrender Clause.

But the Trust argues that the Policy proceeds cannot be distributed pursuant to the Cash Surrender Value Clause "unless there is a premium default and surrender occurs no later than sixty days after the due date of any premium in default."[46] FDIC-R argues that this interpretation does not make sense because any surrender after sixty days of any premium default would be ineffective because the Policy would have lapsed.

The Cash Surrender Clause reads in its entirety:

> The divisions of the cash surrender value of the policy when premiums are financed in strict accord with Paragraph III and when surrender occurs not later than sixty days after the due date of any premium in default, shall be as follows:
>> The Assignee is entitled to an amount equal to the policy cash value less any existing policy loans or cash withdrawals exercised by the Assignee under the provision of Paragraph IV, less any surrender charges applicable as stated in the policy surrender tables.

The plain and ordinary meaning of the Cash Surrender Clause does not condition distribution on the existence of a premium default. Instead the language of the Clause, "when surrender occurs not later than sixty days after the due date of any premium in default" gives the parties a time limit to seek distribution under the Clause. Therefore, the Court agrees with FDIC-R's interpretation and finds that the Cash Surrender Clause allows for distribution of proceeds to FDIC–R if (1) premiums are

---

[45]Assignment ¶IX.
[46]Craig Campbell's Response in Opposition to FDIC-R's Motion for Judgment on the Pleadings and Motion to Dismiss p. 6, dkt 32.

financed in accord with Paragraph III and (2) surrender occurs within sixty days of any premium in default. Premiums were financed in accord with Paragraph III, as it was a one lump payment, and there was no premium in default. FDIC-R is, therefore, entitled to the full surrender of the Policy.

### 3. Additional Arguments

Though we have already found that distribution of the policy value is properly determined pursuant to the Cash Surrender Clause, we will also address the Trust's ancillary arguments. First, the Trust argues that it is entitled to a portion of the proceeds because the Assignment uses words such as "division," and "split," and specifies that proceeds shall be distributed "between the Assignee and the Owner."[47] Specifically, the Assignment is titled "Split Dollar Agreement," and the titles and first sentence of the Death Proceeds Clause and Cash Surrender Clause include the word "division." The Termination Clause also states that the proceeds will be "distributed *between*" the parties "as prescribed by Paragraph VII and VIII." The Court does not believe, however, that the use of these words controls or conditions the plain meaning of the document read as a whole. The use of the word "division" at the beginning of the Cash Surrender Clause, for example, does not obviate the rest of the provision, which states that the Bank, as the Assignee, shall receive "an amount equal to the policy cash value less any existing policy loans or cash withdrawals..."[48]

The Trust also argues that to deny the Trust a portion of the proceeds ignores the entire intent and purpose of the parties entering into the Assignment, which was to incentivise Mr. Campbell to remain employed at the Bank. But we have already found that the Assignment is not ambiguous. And unless a contract is found to be ambiguous, an agreement reduced to writing is "presumed to speak the intention of the parties who signed it."[49] The intention of the parties is determined from

---
[47] Assignment ¶IX.
[48] Assignment ¶VIII.
[49] *Cromeens, Holloman, Sibert, Inc.*, 349 F. 3d at 394.

the language used, not extrinsic evidence.[50] As stated, the Assignment itself provides for the Bank, or FDIC-R in this case, to receive the full cash surrender value.

Next the Trust asserts that it is entitled to the difference between the full surrender value and premium paid because FDIC-R retained only a security interest in the premium paid. This argument again focuses solely on the language in the Assignment that states that the Trust, as owner, retains ownership of the Policy and simply assigns to the Bank "all right, title and interest in the policy as collateral security..."[51] It claims that express retention of ownership, and the grant of security to the Bank for premiums paid (and not for the entire cash surrender value), must result in the Trust receiving a portion of the value of the policy. But the Trust does not tell us how that sentence - regarding the Bank's collateral security interest - requires such a finding. The Trust then states that under FDIC-R's reading of the Assignment, it receives no benefit for the "investment" it made towards the Policy, which was Mr. Campbell's years of employment. That is correct. The Trust receives no monetary benefit. The benefit conferred was that, for those years Mr. Campbell was employed, he had a life insurance policy.

Finally, the Trust argues that it is entitled to the difference between the full surrender value and premium paid because neither the Death Proceeds Clause nor the Cash Surrender Clause applies. The Trust fails, however, to point to any language in the Assignment that indicates the full surrender value can be distributed outside of the circumstances presented in either of those two clauses.

**B.     FDIC-R's Motion to Dismiss**

FDIC-R argues that the Trust is unable to state a claim for unjust enrichment because FDIC-R cannot be unjustly enriched by a benefit received through the exercise of its contractual rights. FDIC-R also requests that this Court deny the Trust's request to amend its claim, to remove any

---

[50]*Id.*
[51]Assignment ¶Introduction.

references of the Assignment, because the Trust cannot cure the defects in its pleading. To the contrary, the Trust argues that there is no express provision that governs how the proceeds of the Policy should be distributed in this instance and, therefore, there is no specific contract to bar its unjust enrichment claim.

### 1. The Trust fails to plead unjust enrichment in the alternative.

The Trust asserts that a party may plead breach of contract and unjust enrichment in the alternative.[52] Federal Rule of Civil Procedure 8(d)(3) allows a party to plead inconsistent or mutually exclusive claims in the same pleading. But FDIC-R correctly points out that although the Trust may be permitted to plead its claims in the alternative, the Trust cannot then refer to the Assignment or incorporate the Assignment in its unjust enrichment allegations.[53] In its count for unjust enrichment, the Trust incorporates all of the paragraphs relating to its count for declaratory judgment of its rights under the Assignment and cites to language in the Assignment.[54] And each of the Trust's unjust enrichment allegations explicitly reference the existence of the Assignment.[55] In fact, none of the Trust's unjust enrichment allegations deny the existence of the express contract.[56] Therefore, we find that the Trust has not properly pled unjust enrichment in the alternative.

### 2. The Trust fails to state a claim for unjust enrichment because the Assignment governs the parties relationship.

Even if a party properly pleads unjust enrichment in the alternative, such a claim will not

---

[52]*See Prudential Ins. Co. of Am. V. Clark Consulting, Inc.,* 548 F.Supp.2d 619, 623 (N.D. Ill. 2008) (noting that under federal pleading standards, "a plaintiff may plead claims in the alternative, even if the claims are contradictory.").
[53]*See Homestead Ins. Co. v. Chicago Transit Authority,* No. 1997 WL 43232, *4 (N.D. Ill. Jan. 23, 1997)(finding where defendant admitted that an express contract governed the parties, and the "unjust enrichment claim alleges an express contract, the unjust enrichment claim must be dismissed under Illinois law.").
[54]Trust's Cross-Claim ¶21-22.
[55]Trust's Cross-Claim ¶¶21-28.
[56]Trust's Cross-Claim ¶¶21-28.

stand if a contract governs the relationship of the parties.[57] A party may plead unjust enrichment in the alternative only when the existence of a valid contract is questioned.[58] Where the existence of the contract is not disputed, a claim for unjust enrichment cannot stand.[59] Once the court has found an express and unambiguous contract exists, a party may no longer recover under the theory of unjust enrichment.[60]

The Trust does not dispute the existence or validity of the Assignment. The Trust, however, argues that the Assignment should be interpreted such that no express provision of the Assignment covers the current circumstances. But we have already determined that the Assignment is an express and unambiguous contract, and one that governs the distribution of the net cash surrender value here. Therefore, the Trust fails to state a claim for unjust enrichment.

**V.    Conclusion**

For the foregoing reasons, plaintiff, FDIC-R's combined motion for judgment on the pleadings and motion to dismiss is granted [dkt. 29].[61]

**IT IS SO ORDERED.**

**ENTERED: January 27, 2012**

                                    **UNITED STATES MAGISTRATE JUDGE**
                                    Susan E. Cox

---

[57] *Ramirez v. Smart Corp.*, 371 Ill.App.3d 797, 809, 863 N.E.2d 800, 814 (3d 2007)(citing *La Throp v. Bell Federal Savings & Loan Asso'c.*, 68 Ill.2d 375, 391, 370 N.E.2d 188 (1977)).
[58] *Hickman v. Wells Fargo Bank N.A.*, 683 F.Supp.2d 779, 797 (N.D. Ill. 2010).
[59] *Hickman*, 683 F.Supp.2d at 797.
[60] *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003).
[61] Dkt. 29.